IN THE FEDERAL DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

Michael Wayne Parsons

Petitioner

vs.                                                              No.:

THE UNITED STATES OF AMERICA

And

THE STATE OF TENNESSEE

Respondents

PETITION FOR HABEAS CORPUS

The Petitioner respectfully petitions this Honorable Court for a Writ of Habeas Corpus to remedy the Petitioner's unlawful detention by the Respondents.

INTRODUCTION

1. Michael Parsons, a Cherokee/Metis man, was initially convicted in Tipton County, served his time and was out on parole, then subsequently was again arrested in Tipton County and charged as a Felon possessing a weapon. After failing to appear, Mr. Parsons was arrested in Nebraska, and convicted as a Felon in possession of a firearm.

2. Mr. Parsons' appeal to the US Circuit Court of Appeal for Nebraska was dismissed.

1

## CUSTODY

3. Mr. Parsons' extended detention, after his first incarceration, has been from 2017 to the present. He was recently transferred from Memphis to the Federal Prison in Arkansas.

## JURISDICTION

4. Mr. Parsons is detained in the custody of Respondents at Forrest City Low, located at 1400 Dale Bumpers Rd., Forrest City AR 72335. **His prisoner # is 30237-047**.

.

5. Jurisdiction for the Habeas is proper under U.S. Const. art. I, § 9, cl. 2, which is the Suspension Clause; the Common Law, as Mr. Parsons is presently in custody under color of authority of the United States and such custody is in violation of the U.S. Constitution, laws, or treaties of the United States; and 5 U.S.C. § 702, as Mr. Parsons suffered a legal and lawful wrong from both Respondents.

## VENUE

6. Venue lies in the United States Federal District Court for the Western District of Tennessee, the judicial district in which Mr. Parsons normally resides, and was initially convicted. But for that conviction, Mr. Parsons would have been in Nebraska with a legal right to carry a firearm, pursuant to an 1817 Treaty with the UNITED STATES OF AMERICA.

## THE PARTIES

7. Mr. Parsons is a Cherokee / Metis man. He is also a member and Envoy of the Chilhqot'in (or Tsilhqot'in) Nation located in the Canadian Province of British Columbia, whose Tribe was recognized by the Supreme Court of Canada in *Tsilhqot'in v BC* [2014].

8. The UNITED STATES OF AMERICA is a country founded by a Declaration of Independence in 1776, with a history of moving Settlors from Europe onto Cherokee Land to intimidate the Native population into completing Treaties, where after the USA Dept. of State would then move more Settlors onto the new Cherokee Treaty Land in order to induce the ceding of even more land by the Cherokee.

9. The STATE OF TENNESSEE was formed on the Cherokee Land of modern Western Tennessee, and is the entity that charged and convicted Mr. Parsons on his Cherokee Land.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Mr. Parsons has exhausted his administrative remedies as required by law. His appeal was dismissed .

## STATEMENT OF FACTS

11. Mr. Parsons was initially arrested at 444 Hughes Rd, in Brighton, Tipton County, TN, for an incident tracing back to an election in 2006, that Mr. Parsons had won by a landslide, where after the votes were flipped with the aid of Judge Joseph Walker III.

12. Mr. Parsons was on the verge of suing Judge Joseph Walker III and others for election fraud when forces behind the voter fraud sent an assassin out to kill Mr. Parsons and his family. Fortunately, Mr. Parsons disarmed the assassin and held the firearm as evidence.

13. When the police arrived, it was Mr. Parsons who was charged with aggravated assault and theft of the weapon. Mr. Parsons was convicted at a trial presided over by Judge Walker and spent over 3 years in jail, then was released on parole.

14. Upon his release he returned to his home. During a trip out of town for his new employer, Mr. Parsons was summoned back to his home by his Parole Officer, at a time when his wife had already procured her firearm (during Michael's absence) as protection against a potential second intruder . The firearm was authorized for Mrs. Parsons by the parole officer but the police <u>again</u> arrested Mr. Parsons as a felon in possession of a firearm .

15. He spent 6 months in jail in 2016 and was released on bond, after Mr. Parsons was almost killed in jail by a hit man witnesses testified was hired by Judge Joseph Walker. Parsons was arrested in Nebraska January 12, 2017, convicted as a felon in possession of a firearm and returned to Western Tennessee, where he was tried and convicted of failing to appear.

4

16. If the original weapons charge should have been tried in a Cherokee Tribunal, since W. Tennessee was still Cherokee land via the 1817 Treaty, Mr. Parsons is NOT a felon.

## CLAIMS FOR RELIEF

## COUNT ONE - CONSTITUTIONAL CLAIM

17. Petitioner re-alleges and incorporates by reference paragraphs 1-16 above.

18. Mr. Parsons' detention violates the Jackson McMinn Treaty of 1817, that was Proclaimed on Dec. 16, 1817, which Treaty recognized the Land of Western Tennessee as Cherokee Land. Further, the Indigenous Peoples were promised self-government, which has not been enforced until *McGirt v US* on July 9, 2020.

Legal or Lawful History

McGirt v US 2020

19. The Land in Western Tennessee has never been disestablished after the Treaty of 1817 :

" On July 9, 2020, the United States Supreme Court ruled that the Muscogee (Creek) Nation (and by extension the Cherokee Nation) had never been disestablished in the years before allotment and Oklahoma Statehood."

See https://en.wikipedia.org/wiki/Cherokee_Nation_(1794%E2%80%931907)

5

Promise of Self government

20. Further, the SCOTUS in *McGirt*, at page 2, confirmed the U.S. government further promised that:

> "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves." via the 1832 Treaty at Article XIV 7 Stat.368

See Treaty With the Creeks, Arts. I, XIV, Mar. 24, 1832, 7 Stat. 366, 368 (1832 Treaty). Both parties settled on boundary lines for a new and "permanent home to the whole Creek nation," located in what is now Oklahoma. Treaty With the Creeks, preamble, Feb. 14, 1833, 7 Stat. 418 (1833 Treaty). The government further promised that "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves." 1832 Treaty, Art. XIV, 7 Stat. 368.

The Jackson McMinn Treaty of 1817

21. At a minimum, Western Tennessee was still the Land of the Cherokee via the above 1817 Treaty, signed by over a dozen Cherokee Chiefs.

See Map sequence at :

https://nativeheritageproject.com/2013/04/15/broken-tennessee-treaties/

22. Subsequently, in 1818, Andrew Jackson formed a 'Treaty' with the Colbert brothers, who were part Chickasaw (so Metis), the Chickasaw Chief Tishomingo and the under-aged boy king Chinubby <u>to purchase the Chickasaw interest</u> in Western Tennessee.

23. In Wikipedia we read :

The land was ceded after prolonged negotiations with the Chickasaw Indians in which the United States was represented by <u>Andrew Jackson</u> and <u>Isaac Shelby</u>, while the Chickasaws were represented by their chiefs, head men, and warriors including: <u>Levi Colbert</u>, his brother <u>George Colbert</u>, <u>Chinubby</u>, and <u>Tishomingo</u>.[4] On October 19, 1818, the two sides agreed to the transfer by signing the <u>Treaty of Tuscaloosa</u>.[5] The United States agreed to pay the Chickasaw people $300,000, at the rate of $20,000 annually for 15 years, in return for the right to all Chickasaw land east of the Mississippi River and north of the new state of <u>Mississippi</u> border.

See  https://en.wikipedia.org/wiki/Jackson_Purchase_(U.S._historical_region)     6

24. The subsequent Jackson Purchase of 1818 was a fraud, as the signer for the Chickasaw Tishomingo and George Colbert were former soldiers in Jackson's Army in the War of 1812. The payment received **for the Chickasaw interest** was in reality a payback to several men only, for fighting on behalf of the US in the War of 1812.

25. From Wikipedia was read :

**Tishomingo** (from Chickasaw: ***Tishu Minco***, lit. 'warrior chief');[1] c. 1735 – c. 1837), also known as **Tishominko**, was chief of the Chickasaw nation until his death, c. 1837.

## Early life and military service[edit]

Tishomingo was born c. 1735 in Mississippi. He served with U.S. Army Major-General Anthony Wayne against the Shawnee in Northwest Territory and received a silver medal from President George Washington. He led by example and was respected for his honesty and high moral standards, serving with distinction at Fallen Timbers, in the Red Stick War with the Creeks, and the War of 1812. During the War of 1812, Tishomingo served under future president Andrew Jackson.[2]

See https://en.wikipedia.org/wiki/Tishomingo_(Chickasaw_leader)

The Majority of the Cherokee Resisted further Cessation after 1817

26. A majority of the remaining Cherokee resisted these treaties and refused to leave their lands east of the Mississippi. Finally, in 1830, the United States Congress enacted the Indian Removal Act to bolster the treaties and **forcibly** free up title to the lands desired by the states. At this time, one-third of the remaining Native Americans left voluntarily, especially because the act was being enforced by use of government troops and the Georgia militia.

See : https://en.wikipedia.org/wiki/Cherokee_Nation_(1794%E2%80%931907)      7

The Leader of the Cherokee in 1817 was John Ross

27. The following text is an extract from John Ross (Cherokee Chief) :

"Ross first went to Washington, DC, in 1816 as part of a Cherokee delegation to negotiate issues of national boundaries, land ownership, and white encroachment. As the only delegate fluent in English, Ross became the principal negotiator despite his relative youth. <u>When he returned to the Cherokee Nation in 1817, he was elected to the National Council.</u> He became council president in the following year. The majority of the council were men like Ross: wealthy, educated, English-speaking, and of mixed blood. Even the traditionalist full-blood Cherokee perceived that he had the skills necessary to contest the whites' demands that the Cherokee cede their land and move beyond the Mississippi River. In that position, Ross's first action was to reject an offer of $200,000 from the US Indian agent made for the Cherokee to relocate voluntarily. Thereafter Ross made more trips to Washington, even as white demands intensified. In 1824, Ross boldly petitioned Congress for redress of Cherokee grievances, which made the Cherokee the first tribe ever to do so. Along the way, Ross built political support in the US capital for the Cherokee cause.

Both Pathkiller and Charles R. Hicks died in January 1827. Hicks's brother, William, was appointed interim chief. Ross and Major Ridge shared responsibilities for the affairs of the tribe. Because William did not impress the Cherokee as a leader, they elected Ross as permanent principal chief in October 1828, a position that he held until his death.

The problem of removal split the Cherokee Nation politically. Ross, <u>backed by the vast majority</u>[citation needed], tried repeatedly to stop white political powers from forcing the tribe to move. He led a faction that became known as the National Party. Others, who came to believe that further resistance would be futile, wanted to seek the best settlement they could get and formed the "Treaty Party," or "Ridge Party," led by Major Ridge. <u>The much smaller</u>[citation needed] Treaty Party negotiated with the United States and signed the Treaty of New Echota on December 29, 1835, which required the Cherokee to leave by 1838. Neither Chief Ross nor the national council ever approved this treaty, but the US government regarded it as valid. Ross and tens of thousands of traditional Cherokee people objected and voted against complying with an invalid treaty, which had been supported by a few hundred mostly assimilated Cherokee.'

[emphasis added].

Treaty of New Echota - 1835

28. Many Cherokee also resisted removal from their ancestral lands in the Southeast, bringing their struggle all the way to the U.S. Supreme Court. But despite the Court's ruling in *Worcester v. Georgia* (1832) that the Cherokee and other tribes were "sovereign nations," the removal continued.

29. In 1835, U.S. government met with a group of Cherokee representatives at New Echota, Georgia, to sign a treaty that traded all 7 million acres of Cherokee land for $5 million and land in Indian Territory.

30. According to a National Public Radio broadcast :

"No more than 500 Cherokee backed the treaty's terms, and everybody involved in the treaty signing was aware of its illegitimacy;"

See: https://www.npr.org/2020/03/31/824647676/a-treacherous-choice-and-a-treaty-right

31. The majority of Cherokee opposed the treaty, but Congress ratified it anyway, and in 1838 the federal government sent 7,000 U.S. soldiers to enforce the removal of the Cherokee.

9

32. The Cherokee later executed all 3 Echota Negotiators on the same day :

"In Oklahoma, Major Ridge, John Ridge and Elias Boudinot faced the consequences of the "death warrant" they had signed. The three men were all killed on the same day, June 22, 1839, at the hands of their fellow Cherokee."

See: https://www.npr.org/2020/03/31/824647676/a-treacherous-choice-and-a-treaty-right

## CLAIM TWO

### THE International Covenant on Civil and Political Rights

### ICCPR and the Right to Self Determine

33. The U.S. ratified the ICCPR in **1992**. Upon ratification, the ICCPR became the "supreme law of the land" under the Supremacy Clause of the U.S. Constitution, which gives ratified treaties the status of federal law.

See : https://www.aclu.org/other/faq-covenant-civil-political-rights-iccpr#:~:text=The%20U.S.%20ratified%20the%20ICCPR,the%20status%20of%20federal%20law.

34. Pursuant to Article 1, Mr. Parsons has the right to self determine as a Cherokee man :

*Article 1*

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

10

## THE ORGANIZATION OF AMERICAN STATES (OAS)

## and the Right to Self-Determine

35. The Inter-American Commission on Human Rights was signed by the United States on April 30, 1948, and ratified on June 19, 1951, with the following Reservation

**2.     United States:**

(Reservation made at the time of ratification)

That the Senate give its advice and consent to ratification of the Charter with the reservation that none of its provisions shall be considered as enlarging the powers of the Federal Government of the United States or limiting the powers of the several states of the Federal Union with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.

See https://www.cidh.oas.org/basicos/english/Basic22b.CharterOAS_ratif.htm

36. Here are the initial sections :

## SECTION ONE:

### Indigenous peoples. Scope of application

### ▼ Article I.

**1. The American Declaration on the Rights of Indigenous Peoples applies to the indigenous peoples of the Americas.**

**2. Self-identification as indigenous peoples will be a fundamental criterion for determining to whom this Declaration applies. States shall respect the right to such self-identification as indigenous, whether individually or collectively, in keeping with the practices and institutions of each indigenous people.**

11

## ▼ Article III.

**Indigenous peoples have the right to self-determination. By virtue of that right, they freely determine their political status and freely pursue their economic, social, and cultural development.**

### CLAIM THREE

### Mr. Parsons is an Envoy of the Hereidtary (Sovereign) Tsilhqot'in Nation

37. In 2014, the Supreme Court of Canada in *Tsilhqot'in v BC* recognized the Tsilhqot'in as the title holders of their Land :

> [153]  I would allow the appeal and grant a declaration of Aboriginal title
> over the area at issue, as requested by the Tsilhqot'in.

38. The title claim had been amended to be brought on behalf of all the Tsilhqot'in People:

> [5] In 1998, the original claim was amended to include a claim
> for Aboriginal title on behalf of all Tsilhqot'in people.

39. At that time, in 2014, the controversy over whether there could be accepted Band Members and Non-Status (not accepted) Tsilhqot'in had not yet been presented to the SCC . The Status (accepted) v Non-Status controversy was resolved in 2016 by the SCC in *Daniels v Canada*, wherein the Crown conceded that the Non-Status Indians existed :

> [20]  To begin, it is unnecessary to explore the question of non-status Indians
> in a full and separate analysis because the Crown conceded in oral argument,
> properly in my view, that they are recognized as "Indians" under s. 91(24), …

12

40. The SCC then went on to hold that the Non-Status Indigenous People did **NOT** need to be accepted by a modern Band, but could simply self-declare and be a member of an ancient Tribe:

[49]   The third criterion — community acceptance — raises particular concerns in the context of this case. The criteria in *Powley* were developed specifically for purposes of applying s. 35, which is about protecting historic community-held rights: para. 13. That is why acceptance by the community was found to be, for purposes of who is included as Métis under s. 35, a prerequisite to holding those rights. Section 91(24) serves a very different constitutional purpose. It is about the federal government's relationship with Canada's Aboriginal peoples. This includes people who may no longer be accepted by their communities because they were separated from them as a result, for example, of government policies such as Indian Residential Schools. There is no principled reason for presumptively and arbitrarily excluding them from Parliament's protective authority on the basis of a "community acceptance" test.

41. The Decision honoured the statement by the SCC back in 1990 *in R v Sioui* that the Indigenous People are a Sovereign Nation :

The mother countries did everything in their power to secure the alliance of each Indian nation and to encourage nations allied with the enemy to change sides.  When these efforts met with success, they were incorporated in treaties of alliance or neutrality.  This clearly indicates that the Indian nations were regarded in their relations with the European nations which occupied North America **as independent nations**. [emphasis added].

42. This holding matches that of CJ John Marshall in *Worcester v Georgia* [1832] :

The Indian nations had always been considered as distinct, independent political communities retaining their original natural rights as undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed, and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. **The very term "nation," so generally applied to them, means "a people distinct from others."** The Constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits

13

their rank among the powers who are capable of making treaties. The words "treaty" and "nation" are words of our own language, selected in our diplomatic and legislative proceedings by ourselves, having each a definite and well understood meaning. **We have applied them to Indians as we have applied them to the other nations of the earth**. They are applied to all in the same sense.

43. The practice of General Andrew Jackson first to allow the encroachment of White Settlers onto what was already Treaty Land of the Cherokee, here, in Western Tennessee, then sign an <u>alleged</u> Treaty with only his former Chickasaw soldier and 2 Metis brothers, violates the law as set down by the US Supreme Court in *Worcester v Georgia* back in 1932. That law has never been overturned.

44. Even though this is 190 years later, the global attitude set forth by the ICCPR and the OAS now dictates that this injustice be reversed.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays that this Court grant the following relief:

1. A Declaratory Judgment that Michael Wayne Parsons is a Cherokee Man governed by an Indigenous Tribunal and not subject to the United States or Tennessee Codes.

2. Issue an order directing Respondents to show cause why the writ should not be granted;

3. Issue a writ of habeas corpus ordering Respondents to release Mr. Parsons on his own recognizance, parole, or reasonable conditions of supervision;

4. Award Petitioner reasonable penalties, costs and attorney's fees;

5. Grant any other relief which this Court deems just and proper.

Respectfully submitted, this 19th day of April 2022.

                                                ASMIN Grand Chief Wabiska Mukwa
                                                ASKIT Chief of Justice